All righty, our next case is United States v. Evers, No. 24-1280. Morning, Your Honor. Morning. Lisa Mathewson for Dr. Evers. I'd like to reserve three minutes for rebuttal. I'll be granted. Your Honor, criminal liability in this case turned on the authorization standard. And the evidentiary linchpin for both sides was the testimony of the dueling expert witnesses. The government concedes that the trial court erroneously limited the defense expert's testimony, that error hamstrung the defense, and the government took full advantage of that. This prejudice was reinforced by the erroneous jury instruction that endorsed the government's view, also articulated by its expert, that a knowing violation of the standard of care suffices to criminally convict a physician for dispensing controlled substances. Separately and together, Your Honors, these errors require a new trial. I'd like to focus on those two issues, though, of course, I'll entertain any questions that the court has. But the intersection of those issues with others, including the overbreath, then, of the government expert's testimony, who was permitted to embed knowledge in the standard of care, all of these issues really intersect. To begin with the expert testimony on the definition of, let's call it the standard for the actus reus. First, just to dispel any confusion that the government, I believe, the government brief may have caused here, we're not complaining that Dr. Evers stands convicted for malpractice, or that he stands convicted simply for negligent violations of the standard of care. And our sister courts of appeals have made that pretty clear, that negligence is not enough to convict. That's pretty obvious, I think. And Ruan, of course, does not address the question of the standard for the actus reus. It hints quite strongly that there's got to be some careful attention to that, both in the majority opinion. Isn't the medical standard of care one of the objective criteria that Ruan talks about? So two points on that, Your Honor. Certainly, Ruan points out, standard of care is relevant. Another point that we've never contested, because there could be expert testimony on standards of care, from which the jury could draw an inference about what everyone assumed at trial here, and for present purposes, we can discuss as well, is the governing standard of usual course of professional practice and for a legitimate medical purpose. That sort of incantatory phrase, Your Honor, which I'll probably botch at some point, actually recurs at various points in the case law, in the statute, but most importantly, in the regulation, as Your Honors know, and has been treated now as defining the actus reus, although as Ruan points out, it's essentially meaningless. It's ambiguous at least, and susceptible of multiple interpretations. But let's go with that, Your Honors, because everybody agreed that that was the standard. Well, but how do we balance the comments in Ruan that those terms, legitimate medical purpose and usual course of professional practice, are vague but also objective? So what do we do with that? So I understand that language in Ruan, Your Honor, to be making the point to distinguish the actus reus from the mens rea. So the conduct that the statute prohibits is the question that was disputed below and is before this court at least in a limited extent. So the court is saying actus reus, knowledge and intent, are over here, off to one side, and of course the court notes as well that the very ambiguity in the actus reus standard is what requires a heightened standard of mens rea, but the court is still saying these are separate points. And where that ends up becoming problematic when put into practice is, and we do see this confusion in the courts of appeals, and perhaps it's unfair to even call it confusion because Justice Alito and two colleagues of his said in concurrence in Ruan, wait a second, we read legitimate medical purpose to be subjective mens rea. The majority in Ruan is saying no, legitimate medical purpose and usual course of professional practice are objective. How one proves that, Your Honor, I think Ruan is very clearly, the majority opinion as well as the concurrence are very clearly flagging for this court and other courts of appeals with the citation to Gonzalez versus Oregon in particular, that there's a real question about the delegation, the scope of authority that the AG has to define the actus reus. None of that is in this case, however, and so just to go back to what is really a far simpler record, the parties and the court assumed that that phrase applied. It was actually in the indictment, in the conjunctive, and so that's what got submitted to the jury. But the government's position consistently, although, was that that phrase as a whole means only knowing violation of the standard of care. And so the duties of legitimate medical purpose and usual course of conduct were equated with standard of care, but with a knowledge overlay. Can you anchor us in the jury instructions for the specific parts that are problematic in your view? Absolutely. So the final instruction, which is in the opening brief at page 27, the question of whether a physician acted outside the usual course of professional practice and not for a legitimate medical purpose is defined by reference to the standard of medical practice prevailing in commonwealth of Pennsylvania, that is, the standard of care. Is there an objection to that language? Oh, yes, Your Honor, yes. This was litigated extensively. In fact, it was the defense submitted— But the charge conference, this paragraph— Oh, very much so, very much so. The defense and the government submitted competing jury instructions, and the defense proposed an instruction that said— That's what I'm getting at, is I know there was a radically different proposal from the defense. Once this language was proposed, there's a preserved objection to this defined— Oh, yes, Your Honor. Well, there was absolutely—at the charge conference, there was ample discussion, and in fact, probably even more expressed, although it was really expressed in both the objection that was discussing the rule on concurrence and explaining the evils of permitting criminal conviction simply for a knowing violation of a standard of care. So this instructional error dovetails, though, with the error on the— But I think the government makes the point that whatever we might think of this language, the term—and I'm at 2518 in the record— uses the word defined comes from Moore itself. Which phrase does? Defined by reference to the standard of blah, blah, blah. That language comes directly from the Supreme Court. I think that if they have a site to that, Your Honor, I will take a look, but I believe that the language that is coming from the Supreme Court in Moore is twofold. First, Moore is talking about standards of practice, but Moore is very much putting that in the context of the text, structure, history, and purpose of the statute. Now, under the Harrison Act, which Moore is very clear is the model for the CSA, what the phrase—and, of course, the professional practice was explicit in the Harrison Act— that phrase was understood to mean you are acting within the scope of the profession that you are registered to act within. And so, ultimately, Moore uses phrases like, were you being a doctor instead of a drug dealer? That's a paraphrase. But that's really the heart of the issue in Moore. And that comports with the history, both because of the textual adoption of courts of practice and because of the transplant from the former soil, as Justice Alito puts it, from the Harrison Act. Now, the particularly interesting point there in terms of how the language comes over is that Moore also uses phrases like legitimate purpose and ultimately ends up combining those two things into— both pieces of what ends up in the regulation are within Moore. Some circuits say that that's disjunctive, but it really is not because you do see that coming through. Was there an objection below to the conscious avoidance instruction? There was, overruled. Do you have arguments in the appeal about the conscious avoidance? We did not raise it as a separate issue on appeal, Your Honor. But it is crucially important because, of course, it lowers the entire standard then for conviction here. And again, when you consider— let's go back to the language in Moore that Your Honor had just flagged and that we were discussing. Moore is talking about having someone who is dealing drugs instead of acting within the course of their profession. And when you take that and overlay that on the expert testimony, what you have is a very unusual feature of these cases, Your Honor. Experts were allowed to testify to what the legal standard means. There was a defense objection to that, too, overruled. So these experts take the stand. The government expert takes the stand and says, legitimate course of medical practice in four of— I am mixing it up, but you get the idea. But the government expert testifies at length over a few days that this means, and he says, it means violating the standard of care and doing it knowingly. That was a 704B violation. Now the defense expert takes the stand and has different criteria. Says expressly, no, this phrase does not mean standard of care. You can be a bad doctor. What do you say to their harmlessness point about that, that you got this argument at other points? It's not supported by the record, and it's absolutely not supported by the standard for harmless error. It's not supported by the record first because what the government cites are a couple of points on cross-exam, three of which simply have the expert saying, oh, yeah, there's other stuff, too, I would look at. And one time he managed to get that in, get the real standard in. And, of course, he looks like he's just tossing things in on cross-examination because he's getting hammered. So that's absolutely—there's no question that that does not come in. And the centrality of this point cannot be overstated. It is the absolute crucial question, what are the criteria for that regulatory standard? What are the criteria for the actus reus? And there are many interesting cases. There are many interesting cases in the pipeline. If I may just briefly finish, Your Honor. Yeah, I have a couple of questions for you, too, so go ahead. Many interesting cases in the pipeline that I suspect will be addressing the question of whether the regulatory standard really does define the actus reus of criminal conduct. But this case is a pretty narrow one. This case requires the court only to acknowledge that the civil standard of care— let's extract out the mens rea— but the civil standard of care does not define the actus reus of a federal crime. And there are a number of reasons for that. Just to move this along, Judge Bovee asked you about the actual jury instruction, and I'm quoting, is defined by reference to, end quote, but the Pennsylvania standard of medical practice. Doesn't that suggest that the standard of care that is by reference to, after saying definition, is simply a benchmark for Dr. Evers' conduct rather than some sort of definition of actus reus? If it didn't have the word defined, Your Honor, perhaps, but it says defined. And let me point the court to— But it also says defined by reference to. Defined by reference to. But, Your Honors, when you go back to your reading record— Are you reading out it by reference to, then? No, no, no, not at all. This was the government's proposal, and the government maintained expressly. I'm honestly not sure whether they still maintain it, but the government argued up one side and down the other that the correct legal standard is knowing violation of a standard of care, that that's all they needed to prove. And there's another sentence in here that I want to call the court's attention to because it also comes from the government's proposed instruction. So, as the court knows, the may consider language comes from the defense proposal. It was error for the court to just tack that on there. At a minimum, it made it extremely confusing, but it really just didn't change the very clear definition. But then the court also says, You have heard testimony that— You have heard testimony about this topic. And I will get, for Your Honors, the point at which the government proposed that. It's Volume 2 of the Appendix 78 and 79. The government proposes, and the district court gives as the third sentence of this instruction, You have heard testimony about what constitutes prescribing controlled substances for a legitimate medical purpose within the usual course of professional practice in the Commonwealth of Pennsylvania. The testimony, Your Honors, was Dr. Thomas and Dr. Rauch. And Dr. Thomas—literally, these folks were on the stand for 7 of the 10 days of trial. And Dr. Thomas said over and over and over again, knowingly violating the standard of care is the crime. So the jury is being told, not just defined by reference to, which the government consistently maintained, and candidly, Your Honor, has waived any argument to the contrary here before this court. The government consistently maintained that that meant knowing violation of the standard of care suffices. They had Dr. Thomas on the stand with his 27-slide PowerPoint telling the jury all about that. And then they got the district judge to tell the jury that the expert testimony is what defines that legal standard. When Dr. Rauch's expert testimony had been truncated in a way that the government concedes was erroneous, that actually elided one of the central points that comes from Moore and was almost indescribably prejudicial to the defense. I just had one other very narrow question. Is there any conflict between our Bennett case and the later Diaz case by the Supreme Court? Not at all, Your Honor. Bennett was referring to the necessarily entails an inference standard. The government suggests that the 2011 amendments to the rule overruled Bennett, but it simply did not. As the advisory committee said, it just simplified. And Diaz really reinforces the point that Bennett makes. Evidence that permits an inference of knowledge is permissible under 704B. Evidence that necessarily entails that inference, where that is embedded in the expert's opinion, violates 704B. And here, when Dr. Thomas said, the difference between civil standard of care, you're not doing it right, and criminal legitimate medical purpose within the usual course, the difference is you're not doing it right and you know it. So he embedded that in his definition of that legal standard. And so that too was a 704B error that just bookends the erroneous truncating of the defense expert testimony. All right. Thank you, counsel. We'll hear from your adversary, and then we'll hear from you. Good morning, Your Honors, if it's still morning. May it please the court. Jeff St. John for the United States. Unless the panel wants to direct me otherwise, I guess I'll begin with the jury charge issue, if that's fair enough. The nice thing about claims of error in the charge is the charge says what it says. We can go back and look at it. Everybody can read it as much as they want to look at it. I want to make two basic points about the claim of error here, or the language that's the subject of the claim of error. The first is it consists in one sentence. One sentence is what is alleged to have been an error. And then the second is it does not say what counsel is suggesting. It says that passage does not equate the standard of care, or it does not equate the actus reus element to a knowing violation of the standard of care. I think the point is both times that the actus reus element, the authorization element is defined, instead of using the term authorization, the instruction uses this long phrase that I'm bumbling, but usual course of professional practice, so they incorporate that into the actus reus element. The part that you're focusing us to at 2518 does use the word defined. And then I think the defendant's point is that once you've limited the actus reus part just to those two considerations, usual course of medical practice and not for a legitimate purpose, defined it by reference to standards, a knowing violation of Pennsylvania standards hits both actus reus and intent, doesn't it? No, Your Honor, because all the work that I see that passage is doing is it's saying, here's the actus reus, which is those two prongs. That is the same thing as the actus reus. And it's referring the jurors to in order to reach a determination about whether the government has shown that that is satisfied as to any prescription, you must look to the standards of medical practice. But that is different from saying that the actus reus is satisfied by any violation of any standard. Well, what else was the jury instructed to look to? Well, the next passage, for example, which is there's three sentences that inform this really what's the charge here. And in the next passage, I would submit to you as impossible as it is to find that the first passage equates actus reus to a knowing violation of the standard of care. The second passage makes that impossible. I think the argument's a little different. It's not that this passage equates it. It's that if you define the actus reus by reference to these two concepts, legitimate medical purpose. I don't mean to interrupt you. That is the actus reus. Those two concepts. Well, another way to say it would be unauthorized. And the jury considers any factors that bear on the word unauthorized in this context. And so there's multiple ways to do this. You have good case law on your side for that. But there's multiple ways to do it. Maybe I could make this point a slightly different way. So it's been alleged also that the government took the position repeatedly at trial that the actus reus was simply satisfied by the knowing violation of the standard of care, right? That's what was just said. I don't think that's what was just said. I think that what was just said is that the defendant could be convicted based on a knowing violation of the standard of care. It's an argument based on the overlap and the interaction between the instructions on mens rea and actus reus. It's not an argument that's exclusively based on actus reus. And I don't think you're doing it justice by minimizing it in that way. Well, our expert, for example, opined that there's such a thing as substandard practice, right? And so just think of this as a trichotomy, right? You have prescribing that is perfectly fine under all standards. Everybody agrees. Then you have prescribing that is substandard. It's below a standard of care, right? That's problematic, but it does not satisfy the authorization actus reus element. There's a third category of things that are below the standard. How could that category exist under this true instruction? Well, because the actus reus is the standards. No, the actus reus is defined by reference. So when deciding, what this is saying to the jurors, when you've been charged with finding this element satisfied or not, in so doing, look to the standards of medical practice. Counsel calls it, my friend calls it the standards of care. It doesn't say standards of care. It says standards of medical practice. But even if we want to call it the medical malpractice standard or the standard of care, it says look to that standard. But it does not say if you find any deviation, however slight, from that standard, you must find the actus reus satisfied. What does defined by mean? Well, in that sense, defined by means, well, the full verbiage, though, actually, is the question of whether a physician, like it's not even saying the element exactly. It's saying the question of whether a physician acted outside the usual course, in other words, acted in an unauthorized way, is defined by reference. I think what it means is look to it, refer to it, reference, refer to the standards, which if you think about it, Your Honors, what else would they refer to? So they look at it. They refer to it. And then what? What's adjourned? Okay. Then they think of all the testimony. They think of the doctor's conduct. And they do an assessment of whether he has strayed sufficiently far from these standards that the actus reus is satisfied. Well, where does it say you have to have a sufficient straying from the standards? It doesn't say that. But by saying, by not saying the other thing, it doesn't say the thing. My point is it doesn't say the thing that counsel is saying it says, which is it's equating the great evil, counsel said, my friend. The great evil of this is it's equating the actus reus with a mere violation of the standard of care. Even our expert did not do that because he repeatedly used this phrase in his testimony, substandard practice, which would be an example of prescribing that is substandard, below the standard of care, but not qualifying under the actus reus, not so far below the standard of care that it would trigger the satisfaction of that element. So that wasn't part of the government's presentation. There's these three boxes, as I tried to say earlier. And so what this is basically saying is in deciding whether or not there's unauthorized prescribing, definitely look to the standards of care. And I ask again, or the standards of medical practice, what else would they look to if not that? But they are the deciders of the case. They decide if the element has been proved. And they have to decide whether they're satisfied based on all the testimony, expert testimony and other testimony. Remember, there was testimony in this case that Dr. Evers admitted to the DEA that when he had certain opioid-addicted patients. We get it. Can I just ask, is whether the standards of medical practice are complied with? Is there a yes or no answer to that question? I'm sorry, I will give it to you if I can, Your Honor. When we ask whether someone adhered to the standard of medical practice, is there a yes or no question to that answer? Yes, yes. If what that means, if that means, it depends on what standard of medical practice means. Because I hear that as being, there's not just one, I don't believe there's just one standard of medical practice. There's a bunch of standards that form, I guess you might say, overall the standard. But yes, there's an answer to it. Did the doctor in any given case adhere with the medical standard that's presented? Yes or no? Yes. But just because the doctor didn't adhere to it, doesn't mean that the authorization element has been satisfied. Doesn't mean the actus reus has been satisfied as to that prescription. We didn't argue that it did. Our expert didn't argue that it did not equate it that way. This jurisdiction doesn't equate it that way. And I've yet to see any court say that this actus reus is satisfied upon a mere violation of any aspect of the standard of care. Your Honor brought up the question of Moore and this verbiage. This verbiage has been blessed, this disputed verbiage, at least a variation of it, has been in jury charges since Moore. Because although Moore didn't take up the charge directly, the jury charge that was being reviewed in Moore or the jury charge that was in the district court in Moore had verbiage similar to this. And the Supreme Court impliedly blessed it, and that's why it has appeared. I took the point in brief about Moore. I think one of the challenges is that Ruan has put so much emphasis on the mens rea as differentiating between criminal conduct and good faith doctoring that this language is pretty risky in a jury instruction. Another part that I find risky in terms of jury confusion is the conscious avoidance charge. And I would like to understand what specifically was the factual predicate that justified giving the jury this instruction. The willful blindness charge, Your Honor? Yeah. OK. So, I mean, I didn't do a lot of thinking about that because that wasn't the subject of the appeal. But my understanding is that the idea is, for example, the pharmacist's testimony. So we introduced the pharmacist's testimony under 404B as indicative of Evers' knowledge. And the idea was with all these pharmacists calling him up, implicitly questioning the excessiveness of these prescriptions, it was evidence either that he knowingly prescribed going forward in a way that was unauthorized or he would have had to have hit his head in the sand to not… And I think it's a very fair argument that that gets you to reading from the instruction at 2522. Dr. Evers himself subjectively believed there was a high probability that these facts existed. I think based on the testimony you just described, the jury could probably reach that inference. What I'm not as confident about as I look at the record is the second aspect of the conscious avoidance instruction. This is at 2522? Yeah, deliberate efforts to avoid knowing. It's the deliberate efforts part which is, in my view, what really warrants giving a pretty risky instruction to the jury when you have that affirmative contrivance by a defendant to avoid the guilty knowledge. And I'm wondering if you can point me to anything on that second point. Well, you know, there certainly was an awful lot of testimony in the case about these being very drug-addicted people. And they were going into local ERs, for example, and they were seeking… So the three main, the three charged patients, Ms. Dane, Ms. Clancy, Mr. Konikowski, were very drug-addicted. And they would, they were under Evers' care. And they would routinely go into local ERs, maybe not all three of them, but certainly a couple, two of them. And they would engage in drug-seeking behavior where they would demand drugs or they would sometimes be given and sometimes wouldn't be. This information was known by Dr. Evers at least at times. And he consciously, he deliberately did not put that information in the patient's charts. He kept that out of the record, let's say, of the case. You know, there's evidence that as to at least two very unjustifiable prescriptions, he did not document either of them. And I can note both of them, but one of them is a prescription. One of them is unfortunately the prescription that was the last prescription prescribed for the death results victim. That was an OxyContin prescription for Michelle Clancy on February 5, 2019, where she alleged to have lost her medications in a bus. And Evers wasn't going to prescribe that for her, but then I guess she pressed him, he did. And then he didn't document that prescription at all. Michelle Clancy overdosed on that OxyContin. And then on September 2nd of 2014, he wrote a fentanyl prescription for Ms. Dame. You know, that was at a time. Just to do it by reference to the pharmacist, any evidence where Dr. Evers said, stop talking to me. I'm not going to communicate with you anymore if you continue to give me this type of feedback about my prescriptions. To me, that's the kind of thing that reaches the level of deliberate efforts to avoid knowing about the existence of these facts and could warrant an instruction like this. Otherwise, it just looks like a big tinderbox in the middle of the instructions. I just don't have the best answer for your concern just because it wasn't raised. I'm doing my best. I appreciate it. And I'm just thinking this through with you. I want to emphasize this, though. There is one and only one sentence in this jury charge that they objected to, and it's the one we've read a couple times. The very next sentence was their sentence. So they pretty much, if you look at page 25 of my opponent's brief, where I believe she sets out the charge that they wanted and the relevant charge that they wanted. If you really look at that and you compare what got into the jury charge, there's very little difference to it. They got most of what they wanted, including this second sentence. So the only real, as far as just distilling this down, point one of this appeal is that the jury was mischarged. How were they mischarged? They were mischarged as a result of that one sentence. And based on that one sentence, counsel is asking this court to upend a 14-day trial and 71 guilty. Nobody here would do that lightly. I know that. And I don't know if your friend is in agreement with the way that you framed your argument. But I would like to talk a little bit about the expert testimony as well, in both sides of it. I mean, there's your expert with the language. The usual course of practice is when you're not doing it right and you know it. And so it seems like a real problem to me that he tied knowledge in to his opinion, given everything else that we're talking about in these instructions. And so I'd like you to address that. All right, so there's a lot to be said, I guess, on this. So the first thing is, counsel argues that the expert injected a knowledge criterion into the entire case. But our expert sets out his criterion in the very beginning of his testimony. He doesn't say this. I mean, he said it. He did say it. My point is not when he's setting out his standards. He doesn't. It comes up late in his testimony in specific discussion of this one patient, Mr. Konikowski. So my point is this was not a criterion that he tried to impose on the whole case. He would have put it early if that's what he was going to do. It only comes out as he's discussing this patient. And I don't believe he is doing what counsel is arguing he's doing. I think what he is saying there is when you're assessing whether a prescription is authorized or not, meaning whether the actus reus is met, has nothing to do with mens rea here. You must think about what the doctor knows and when he knew it. And if a doctor prescribes in the face of certain problematic knowledge he has of what's going on with the patient, that's unauthorized prescribing. So I don't think it's an opinion about mens rea at all. And I think counsel even acknowledges that. That's why she uses this necessarily refers to version of that or necessarily follows. And I've argued, as the chief judge noted, I've argued that Diaz I think does away with the necessary follows iteration. I don't think the testimony is problematic because I don't think the necessary follows thing is applicable here. But I also think Diaz maybe takes that away as a theory of a violation of Rule 704B. I see my time is up. I don't know if there's other questions on any of these other issues. There's a number of issues. Getting the defense expert. I'm sorry. Go ahead. I just want to understand the scope of the government's concession of error on the defense expert. Okay. So I'm arguing that Diaz even narrowed further 704B. So certainly if my reading of Diaz is correct, the opinion of their expert that drugs or sex, that the relevant criterion for him is whether drugs or money are exchanged for a prescription, that that should have been permitted. And I would concede probably even more that even under the old regime, I'm going to call it, if you don't accept the idea that Diaz changed anything, I think it was a permissible opinion. So long as the opinion wasn't going to be expressed that if there isn't drugs or if there isn't money or sex, if there isn't money or sex, then it can't not be unauthorized. And I don't think that's how it was going to be addressed. I think it was going to be, you know, I have a third criterion. It's whether there's a quid pro quo exchange. So I think that should have been permitted. So that's our concession. But nonetheless, I think for the reasons that were alluded to, it's harmless error, both because it was permitted, it came in anyway, without objection or exclusion. And then in closing, trial counsel got to make the argument it wanted to make, which was, listen, there's no evidence in this case of that kind of quid pro quo exchange. And there wasn't. And the government never suggested there was. So the jury got that. And our expert was looking for it. And our expert said that's important and it's not here. So I struggle to see. And the last thing I'll just say is this argument that it's the beating heart of their defense or that the exclusion of this or this lack of sex or drugs, how could something that the government is not required to prove, right, we're not required to show in a doctor prescribed case that there was a quid pro quo exchange of money or sex. How could that be the beating heart of the defense? The beating heart of their defense or the battle of the experts, the beating heart of the real disagreement was their expert said, if a patient comes in and complains of pain, okay, and there's a doctor-patient relationship and the patient complains of pain, it's not unauthorized to write for that patient. And our position was that's silly. And the jury took our side in that because, of course, when people are drug-addicted and desperate, you cannot just uncritically accept what they say about their back pain and then justify any amount or any dosage of highly dangerous, highly destructive opioids, unless there's anything for it. Would the complaint of back pain and, let's say, an assessment that that was a legitimate complaint, notwithstanding the drug addiction, would that constitute a legitimate medical purpose? Yes. If there was a thorough doctor analysis and the doctor had reasons and could point to reasons why the patient was really in pain. But, of course, the evidence in this case showed only very perfunctory patient exams, no drug testing, no serious engagement with these patients, apart from just prescribing what they asked him to prescribe. All right. So it's the additional investigation. Once a doctor has made an assessment that the drug-addicted patient is truly in pain, it's the additional assessment that's necessary to decide whether prescribing opioids would be inappropriate. Lou, side note, Your Honor, is these individuals were prescribed these medications for years. So, yes, they may have come in initially with a complaint of pain. They had physical problems. I don't think that's disputed. But the point is that over the course of the treatment, there stopped being treatment for any medical— I guess what I'm trying to get, though, is whether when we're talking about the usual standards, or what is the phrase, the usual standards of medical practice or professional practice, if that's where—if that is really distinct from the legitimate medical purpose, which to me is the goal. You know, the end is to treat the pain, and the means is how you do so according to the professional practice standards. Is that how you see it? Well, I'm a little bit confused by the question, I'll be honest with you. Could you just possibly restate it again? I'm sorry. So I think you said that you—authorization means you have to have a legitimate medical purpose and— Usual course of professional practice, and not— Right. Are those two distinct things? In this case, the Department of Justice's position is that it should be charged as one. This is just an aside. It should be charged as one element, that it's actually just one element. But in this case, my colleagues below agree to it being charged as two. So it's two separate things, at least the way the jury was charged, and at least how it's considered in this case. Okay. And so there are two things. One is legitimate medical purpose. One is about the standards of professional practice. Right. So the standards of professional practice are not necessarily implicated in the inquiry into a legitimate medical purpose, right? Well, see, I think in the jury charge in this case, to be fair, you know, the way the provision that they're objecting to says, the question of whether a physician acted outside the usual course of his professional practice, that's the first part, and not for a legitimate medical purpose, that's the second part, is defined by reference to the standard of medical practice generally recognized and accepted. So the jury charge here took both parts of them and tied them to, at least to some extent, the generally applicable standards. So they're both informed by that. Well, and that was almost verbatim what the government urged the district court to adopt, right? That first sentence is verbatim what we urged them to adopt. The second sentence, which modifies the first sentence, is verbatim what they, other side, asked the district court to adopt. And so you stand by that in order to determine whether someone acted outside of the course of the professional practice and in order to determine whether they had a legitimate medical purpose, you look to the standard of medical. Yes, you would refer to those, the jury should refer to those standards in reaching its conclusion about whether there was a deviation from those standards to the degree that the actus reus is satisfied. Thank you, counsel. Thank you, your honors. Your rebuttal now. That's enough of the question to counsel. Come on, come on up. Yep. How should this court then define the actus reus of Section 841? All the court has to do in this case, your honors, is to say, no, it is not equivalent to the standard of care. There are myriad reasons for doing that, but reversal is required simply with that holding. Now, if the court would like to know what I think is the right answer, I think the court must. I think the court must look to more. I don't think that there was a delegation of authority to define standards of medical practice to the AG. Gonzalez versus Oregon is very clear that when you're talking about the content of what's allowable doctoring and what isn't allowable doctoring, that's not a decision for the AG to make. But I do think that more ultimately is the one construction of Congress's enactment that we have in this context. And more, especially when you look at text structure and purpose and the history, including the Harrison Act cases, more is very clear that what it is talking about with course of professional practice and what it calls legitimate purpose, to Judge Freeman's point, is are you acting within the scope of that profession that you are licensed and registered to practice? Are you doing something that may be considered medical care, even if it is the worst medical care conceivable? That's what makes for a criminal case. Because as Moore says, really the Controlled Substances Act is about diversion. It is about controlled substances being distributed or dispensed outside permissible channels. And ultimately, it is about the question of was this doctor prescribing to treat a patient or was the doctor prescribing for personal profit or some other illicit non-medical purpose? Even though purpose in this context, of course, is actus reus and not mens rea. Now, to Judge Freeman's questions earlier to my friend on the other side, we're in prime jury territory when we start talking about, yeah, but they've been on the drugs for a long time. And yeah, they were in pain, but he'd seen them for years. Well, yes, he'd seen them for years. He was their primary care doctor. And in fact, the defense expert testified to things that were directly contrary to the government, like, for example, the fact that sometimes you have to pick the least bad alternative when you're treating patients that many people wouldn't treat at all. And he was saying, essentially, that this is within the scope. Now, as we heard from the government, he ended up looking silly. And he looked so silly because he was allowed to say only three things. If you have a registration and if you have a doctor-patient relationship and if there's a complaint of pain, that's enough. What he was really saying was these are the criteria that I would look at and one of them comes directly from Moore, and that is whether there's a non-medical purpose to the prescribing. But he wasn't allowed to say that, which only really underscores the prejudice, both from that exclusion and from the instruction. I have a couple questions for you. Your client's proposed jury instruction says that to determine whether the defendant acted outside the usual course of professional practice, you may consider the standards that medical professionals use. But it doesn't say that you're supposed to look at those standards to consider whether there was a legitimate medical purpose. Why is that? I suspect, Your Honor, because, candidly, this was six months after Ruan, and the defense counsel were looking to instructions that had been given in district court cases at that time, and there had not been any robust development of the post-Ruan intersection of Actas Reyes and Mans Reyes. But, to Your Honor's point earlier, multiple circuits say these phrases mean the same thing. And, in fact, when you look a little bit lower in 130604, the regulation, you'll see that the first sentence is the one we've all been stumbling over, kind of quoting a little bit. The third sentence is a variation on that, and it says, I forget, but, you know, some variation on legitimate, and it flips the or around. I really think that these are, you know, the circuits that treat these as two different standards and say standard of care suffices, the language that I now realize that, Your Honor, Judge Bowie was referring to earlier, they're construing the regulation. If you look at those opinions, they say things like, well, the plain text of this regulation suggests that's not what the court's doing. The court's construing the statute. Just to clarify, in your view, legitimate medical purpose and adhering to the standards of practice are the same thing? This is my view, Your Honor, and I think it's important to say here, standards of practice not meaning standard of care. What Moore is referring to is, are you acting within the scope of your profession? Are you doing this to treat a patient, or are you doing it to make money out the back door? So when I use the phrase standard of practice, and again, the chief asked me, you know, what's my view? I do think that they are saying the same thing, and I do think, and they have to, because Moore is the only authoritative construction of the statute, and the statute controls here, not the reg. So at the end of the day, that is what Congress has left us with, and that's what the statute defines. And if there's a gap there, then that's for Congress to do. Your Honor, Judge Chigaris, you noted that in the Foucouris case a couple of years ago, when the government was here under a food drug cosmetic act saying, oh no, the sky will fall if this dismissal of the indictment is affirmed. And Your Honor's opinion notes, take it to Congress. Don't take it to the court if you think there's a gap. But again, this is a narrow case. The court does not need to wade into all of this. I promise you, there will be cases that are going to be raising the delegation issue. There are a couple, I believe, that might even be on their way to the cert stage now. And I think that this is an issue that folks who see that flashing red light in room with the citation to Gonzales are going to start picking up on. But the court doesn't even have to go that far here. If I may just briefly give some citations to the record on some points that the government articulated. May I, Your Honor? Sure. OK, great. So just one. Well, I mean, one at a time. So on the question of whether the government, in fact, endorsed standard of care below. Quotation from Volume 5 of the Appendix 2351. The government would argue that the Pennsylvania standard is what's at issue. Again, I believe the statement in the jury instruction that when the jury is trying to figure out what is the usual course of professional practice and legitimate medical purposes, it's defined by reference to the standard of medical practice. It's the standard of care. That's been the government's position. Also, I believe, Your Honor, Judge Freeman asked about where does this even get teed up for the jury? Why is the jury even being told what the definition of standard of care is? I seem to have. I think it was 2515. No, I'm sorry. 2517. The jury is told the elements the government must prove. The second one is distribution of the substances was outside the usual course of professional practice and not for a legitimate purpose. So then that flows into the instruction defining that. There's another key aspect of the defense proposal that the government doesn't know. This isn't a one sentence error. Frankly, even if it were, it couldn't be harmless beyond a reasonable doubt. But the defense asked the trial court to instruct the jury as well. There's no legal definition of usual course of professional practice, legitimate medical purpose. You may consider the standard of care when deciding it. That's crucial here, too, because instead the court said to the jury there is a definition. It's defined by the standard of care. And you heard about it from the experts, one of whom was allowed to go too far. The other of whose testimony was unfairly truncated. You know, the government says this is my last. You're going to wrap it up. OK, absolutely. The government says that, yes, they concede. It was a permissible opinion by the defense expert that it's relevant. It's an important criterion, whether there's the improper trading that the Moore case refers to. The reason the government makes that concession is because the same prosecutor elicits the same testimony from the government expert when it helps the government. And instead, in this case, the government insisted that it's impermissible and it's 7-4-B and it's irrelevant. And then told the jury that this is smoke and mirrors. We do not have to prove it at all. That asymmetry, your honors, was highly prejudicial across the entire panoply of the errors in this case. Thank you, counsel. We thank counsel for their excellent arguments today, both orally and their written briefs. We will take the case under advisement.